UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v.-

HECTOR EMILIO FERNANDEZ ROSA,

                  Defendant.

12 Cr. 894 (RJS)

## THE GOVERNMENT'S SENTENCING SUBMISSION

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Matthew J. Laroche
Assistant United States Attorneys
    *Of Counsel*

## TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 2

   I. Honduras: A Major Transshipment Point for U.S.-Bound Cocaine Plagued by Violence ..... 2

   II. The Defendant's Offense Conduct ................................................................................. 6

      A. Drug Trafficking ...................................................................................................... 6

         1. 1998 – 2003: The Defendant Enters the Drug Trade as a Transporter ......................... 6

         2. 2004 – 2008: The Defendant Manages the Distribution of Multi-Ton Cocaine Shipments .......................................................................................................... 7

         3. 2008 – 2010: The Defendant Imports Ephedrine for the Sinaloa Cartel ....................... 8

         4. 2010 – 2014: The Defendant Focuses Exclusively on Cocaine Distribution ................ 9

      B. The Defendant's Weapons and Violence ................................................................... 11

         1. 2000: The Murder of a Potential Kidnapper ................................................................ 12

         2. 2003: The Torture and Murder of a Drug-Trafficking Rival ....................................... 13

         3. 2006: The Murder of Danny Hernandez ..................................................................... 13

         4. 2008: The Assassination of Congressman Mario Fernando Hernández Bonilla .......... 13

         5. 2010: The Attempted Murder of Diaz Morales ........................................................... 14

         6. 2013: The Torture and Murder of "Raffa" .................................................................. 15

         7. 2013: The Massacre Resulting in the Murder of "Muco" ............................................ 15

   III. Procedural History ...................................................................................................... 15

THE SENTENCING GUIDELINES AND DEFENSE OBJECTIONS TO THE PSR ............. 16

   I. The Guidelines and the Probation Office Recommend Life Imprisonment ....................... 16

   II. The Defendant's Factual Objections to the PSR ............................................................. 16

      A. PSR Paragraph 18 .................................................................................................. 16

      B. PSR Paragraph 29 .................................................................................................. 17

      C. PSR Paragraph 33 .................................................................................................. 17

      D. PSR Paragraph 42 .................................................................................................. 17

      E. PSR Paragraph 51 .................................................................................................. 18

      F. PSR Paragraph 52 .................................................................................................. 18

      G. PSR Paragraph 55 .................................................................................................. 18

      H. PSR Paragraph 118 ................................................................................................ 19

   III. The Defendant's Objection to the Leadership Enhancement is Meritless ....................... 19

      A. Applicable Law ...................................................................................................... 19

      B. Discussion ............................................................................................................. 20

DISCUSSION ............................................................................................................... 21

    I. The Court Should Impose a Life Sentence ........................................................ 21

    II. The Court Should Impose $50 Million of Forfeiture ........................................ 27

    III. The Court Should Order the Defendant to Pay a $10 Million Fine .................................. 27

CONCLUSION ............................................................................................................ 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | 12 Cr. 894 (RJS) |
| HECTOR EMILIO FERNANDEZ ROSA, | |
| Defendant. | |

The Government respectfully submits this amended memorandum in advance of the defendant's sentencing, which is scheduled for August 2, 2019.[*]

The defendant was the leader of a violent and prolific drug-trafficking organization.  He ravaged his own country and contributed to deteriorating conditions in the region by sending huge quantities of poison to the United States.  He helped import approximately 135 tons of cocaine into this country between 1998 and 2014.  For two of those years, between 2008 and 2010, he also helped bring approximately 20 tons of ephedrine into Honduras to be used in a joint methamphetamine-production venture with high-ranking lieutenants of Joaquin Guzman, a/k/a "El Chapo," in the Sinaloa Cartel.  The defendant made approximately $50 million in blood money through this egregious course of conduct.  In order to accomplish these astonishing levels of drug distribution, the defendant bribed politicians, police, and military officials.  He also caused at least approximately 19 murders, including the November 2008 assassination of Honduran congressman (and former co-conspirator) Mario Fernando Hernández Bonilla.  At least two of the murder victims were also tortured.

Under these circumstances, the only appropriate sentence is the statutory maximum.

---

[*] This amended memorandum corrects a typographical error on page 1 of the Government's July 26, 2019 submission relating to the drug quantity applicable to the defendant, which includes approximately 135 tons of cocaine rather than 153 tons.

1

Accordingly, the Government respectfully submits that the Court should impose a sentence that includes life imprisonment, a $10 million fine, and $50 million in forfeiture.

## BACKGROUND

Set forth below is a discussion of the historical backdrop for the defendant's crime, which is relevant to the evaluation of the seriousness of his conduct, and a discussion of his 15 years in drug trafficking.

### I.   Honduras: A Major Transshipment Point for U.S.-Bound Cocaine Plagued by Violence

By the late 1990s, multiple drug cartels operating in Honduras started to work in concert with politicians, law enforcement officials, and military personnel to receive large shipments of cocaine that was produced in Colombia, dispatched north from Venezuela via air and maritime routes, and arrived in Honduras either on the Atlantic coast or over land through Nicaragua.

Several factors exacerbated this trend and led to Honduras becoming one of the main transshipment points in the world for cocaine that is produced in South America and imported into the United States.[1]  In approximately 1997, Colombia resumed extraditing Colombian nationals to the United States to face drug-trafficking charges.  As a result, drug traffickers in South America started to send drugs "up through the Central American corridor"—rather than through the Caribbean to South Florida—"in order 'to recede from their role in getting the cocaine to the United States.'"  *United States v. Campo Flores*, 15 Cr. 765 (PAC), 2017 WL 1133430, at *7 (S.D.N.Y. Mar. 24, 2017) (quoting expert testimony).

---

[1]*E.g.*, United Nations Office on Drugs and Crime, *World Drug Report 2016* at 37-38 (2016), http://www.unodc.org/doc/wdr2016/WORLD_DRUG_REPORT_2016_web.pdf; *see also* Steven Dudley, *How Drug Trafficking Operates, Corrupts in Central America*, InSight Crime (July 6, 2016), http://www.insightcrime.org/news-analysis/how-drug-trafficking-operates-corrupts-in-central-america ("Central America has long been a bridge that connects the producer countries in South America to the consumer nations in the north, principally the United States.").

In addition, in approximately 1999—around the time that the defendant started to help distribute cocaine in Honduras—a Venezuelan trafficking-organization comprised of high-ranking officials and others, known as the *Cartel de Los Soles*, emerged for the purpose of enriching its members and using cocaine as a weapon against the United States due to the adverse effects of the drug on individual users and the potential for broader societal harms arising from cocaine.[2] Members of the *Cartel de Los Soles* worked with the leadership of the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") in Colombia in connection with guns-for-drugs trades that led to thousands of kilograms of cocaine being sent to the United States and the FARC being armed with additional military-grade weapons for use in terrorist attacks.[3] Finally, in contrast to Colombia, Honduran law did not permit extradition of Honduran nationals for purposes of U.S. drug-trafficking prosecutions until 2012.[4] The first such extradition did not occur until May 2014, when Honduras extradited Carlos Arnoldo Lobo, a/k/a "Negro," to face cocaine-importation charges in the Southern District of Florida.[5] The defendant was extradited by Honduras just five months later.

Prior to his apprehension, however, the defendant and other Honduran traffickers thrived. They made millions of dollars and infiltrated Honduran institutions at all levels of the government

---

[2] (Superseding Indictment ¶ 2, *United States v. Hugo Armando Carvajal Barrios*, S1 11 Cr. 205 (AKH)).

[3] (*Id.* ¶¶ 3-4).

[4] *See* Hannah Stone, With Extradition Law, Honduras Outsources Justice to US (Jan. 31, 2012), https://www.insightcrime.org/news/analysis/with-extradition-law-honduras-outsources-justice-to-us.

[5] DOJ, Alleged International Narcotics Trafficker Extradited From Honduras On Cocaine Distribution Charges (May 9, 2014), https://www.justice.gov/usao-sdfl/pr/alleged-international-narcotics-trafficker-extradited-honduras-cocaine-distribution.

by pouring drug proceeds into political campaigns related to the Honduran presidency, congressional seats, and local positions such as mayors.[6]  The defendant did this in 2005, as discussed below, when he and a co-conspirator paid over $2 million in drug proceeds to an official who ultimately served as President of Honduras beginning in approximately 2006 ("Official-1"). (July 2, 2019 Presentence Investigation Report ("PSR") ¶ 33).  In approximately 2009, around the time of a coup that forced Official-1 out of office, the leaders of a Honduran drug-trafficking organization known as the *Cachiros*, which later aligned with the defendant to participate in both drug shipments and murders, paid approximately $500,000 in drug proceeds to support the campaign of the then-congressman who became President in 2009.  In addition to using drug proceeds to bribe presidents and other high-ranking officials, Honduran traffickers such as the defendant obtained further protection from official interference, and facilitated the safe passage through Honduras of their massive cocaine shipments, by bribing other public officials, police, and military personnel for access to information about ongoing investigations, military and law-enforcement checkpoints, and planned narcotics interdictions.  (*See, e.g.*, PSR ¶ 32).  Thus, "[g]overnment institutions were subject to corruption and political influence, and some officials

---

[6] *See, e.g.*, *United States v. Najera Montoya*, 15 Cr. 378 (PGG) (former Honduran congressman facing mandatory minimum sentence of 40 years' imprisonment after pleading guilty without a plea agreement to conspiring to import cocaine and related weapons offenses); *United States v. Zelaya Romero, et al.*, 15 Cr. 174 (LGS) (seven former members of the Honduran National Police pleaded guilty to conspiring to import cocaine); *United States v. Rosenthal, et. al.*, 13 Cr. 413 (JGK) (former Honduran congressman and presidential candidate, and former Honduran congressman and cabinet official, both pleaded guilty to money-laundering charges); *United States v. Turcios Martinez*, 18 Cr. 499 (LAK) (former Honduran congressman charged with conspiring to import cocaine and related weapons offenses); *United States v. Urbina Soto, et al.*, 18 Cr. 497 (DLC) (former Honduran mayor and others charged with conspiring to import cocaine and related weapons offenses); *United States v. Ardon Soriano*, 19 Cr. 45 (PAE) (former Honduran mayor charged with conspiring to import cocaine and related weapons offenses).

4

engaged in corrupt practices with impunity."[7]   In November 2018, the brother of the current President of Honduras was arrested in Miami based on drug-trafficking and weapons charges with allegations dating back to 2004, and he is scheduled to proceed to trial in October 2019 before Judge Castel.[8]

In the United States, the proliferation of large-scale drug trafficking in South and Central America contributed to border-security concerns and widespread narcotics-related public health problems.[9]   South of the U.S. border, segmented drug-trafficking cells such as the one run by the defendant led to rapidly deteriorating country conditions in the region.   By the time of the defendant's extradition in 2014, Honduras and Venezuela were—and in many respects still are—two of the most violent places on earth.[10]   There is an ongoing human rights crisis in Venezuela based in part on the activities and corruption of some members of the *Cartel de Los Soles*.[11]

---

[7]   U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 17, https://2009-2017.state.gov/documents/organization/236910.pdf.

[8] (*See* Superseding Indictment ¶ 4, *United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC) (alleging that Hernandez Alvarado "was involved in processing, receiving, transporting, and distributing multi-ton loads of cocaine")).

[9] *See* 21 U.S.C. § 1901(a)(4) (1999) ("There is a national emergency resulting from the activities of international narcotics traffickers and their organizations that threatens the national security, foreign policy, and economy of the United States.").

[10]*See* U.S. Dept. of State, *Honduras 2014 Human Rights Report* at 1 ("Pervasive societal violence persisted.   Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, torture, human trafficking, and intimidation of journalists and human and worker rights defenders."); *see also* "SOUTHCOM chief: Central America drug war a dire threat to U.S. national security," *Military Times* (July 2014) ("By U.N. statistics, Honduras is the most violent nation on the planet with a rate of 90 murders per 100,000 citizens. . . . These figures become more shocking when compared to those of declared combat zones such as Afghanistan or the Democratic Republic of the Congo (28 in 2012).   Profits earned via the illicit drug trade have corrupted and destroyed public institutions . . . , and facilitated a culture of impunity – regardless of crime – that delegitimizes the state and erodes its sovereignty, not to mention what it does to human rights.").

[11] *See, e.g.*, FinCEN, Advisory: Advisory on Human Rights Abuses Enabled by Corrupt Senior Foreign Political Figures and their Financial Facilitators (June 12, 2018),

## II. The Defendant's Offense Conduct

### A. Drug Trafficking

#### 1. 1998 – 2003: The Defendant Enters the Drug Trade as a Transporter

In 1998, the defendant began his drug-trafficking career working with a cell of Guatemalan and Honduran traffickers led at that time by Mario León Ardon ("Mario León"), Juan Jose "Juancho" León Ardon ("Juancho León"), and Luis Antonio Santos Tobar, a/k/a "Tonito." ("Tonito Santos").  (*See* PSR ¶ 10).  When the defendant entered the drug trade, this group was coordinating the receipt and transportation of cocaine shipments that varied in size between 50 and 300 kilograms.  (*See id.*).  They were receiving shipments from Colombia in Nicaragua, which were sent principally over maritime routes, and then transporting the cocaine over land to the Honduras-Guatemala border so that it could be sold to Guatemalan and Mexican traffickers who imported the drugs into the United States.  (*See id.*).

Between approximately 1998 and 2003, the defendant helped León's group distribute a total of approximately 5,000 kilograms per year.  (PSR ¶ 9).  The defendant picked up the cocaine shipments from co-conspirators near the Honduras-Nicaragua border in San Marcos de Colón, Choluteca, loaded the drugs into a trap hidden in a cattle truck, and drove the shipments to El Paraíso, Copán, which is near his hometown as well as the Honduras-Guatemala border.  (PSR ¶ 11).  Mario León arranged for the police to be bribed throughout the defendant's transportation segment in order to ensure safe passage of the drugs, and he paid the defendant between $2,000 and $3,000 per trip.  (*Id.* ¶ 11).

---

https://www.fincen.gov/sites/default/files/advisory/2018-06-12/PEP%20Facilitator%20Advisory_FINAL%20508.pdf.

## 2.  2004 – 2008: The Defendant Manages the Distribution of Multi-Ton Cocaine Shipments

After Mario León was murdered in approximately 2003, his brother Juancho led the group

and the defendant assumed a management role.  (*See* PSR ¶ 12).  Between approximately 2004

and 2008, the defendant helped distribute numerous larger shipments of between 1,500 and 2,000

kilograms of cocaine.  (*Id.* ¶ 13).

One of the reasons that the defendant and his co-conspirators started to obtain larger

shipments was that they cultivated new connections.  They started to work with "Tito" Montes

Bobadilla—another large-scale, infamous Honduran drug trafficker—whose family was receiving

huge cocaine shipments from Colombia in the Colón Department on the Atlantic coast in

northeastern Honduras.[12]  The defendant also forged a criminal relationship with Victor Hugo Diaz

Morales, a/k/a "Rojo,"[13] in the Copán Department as they worked together to receive and secure

safe passage for thousands of kilograms of cocaine year.

The defendant's ascension in the ranks permitted him to retire as a transporter and take on

a coordination role that presented less legal risk should one of the shipments be seized.  Between

approximately 2004 and 2008, the defendant oversaw the transportation of the cocaine from Colón

to Copán using larger tractor trailers with bigger traps.  (*See id.* ¶ 13).  Instead of driving the trucks,

---

[12] *See* DOJ, Former Leader of Honduran Cocaine Trafficking Organization Sentenced to 37 Years in Prison (Apr. 5, 2019) (explaining that "the Montes-Bobadilla drug-trafficking organization" was "one of the largest drug cartels in Honduras," "distributed thousands of kilograms of cocaine," and "engaged     in     numerous     acts     of     violence,     including     murder"), https://www.justice.gov/opa/pr/former-leader-honduran-cocaine-trafficking-organization-sentenced-37-years-prison.

[13] Paragraph 18 of the PSR refers to Diaz Morales by an alias, "Victor Manuel Villeda."

he often rode in an escort vehicle so that he could intervene if a problem arose, such as the need to pay off yet another official.  (*See id.*).

In approximately 2005, the defendant and Juancho León worked to protect their drugs and drug profits by installing an ally as the Vice Minister of Security in Honduras.  (PSR ¶ 33).  That year, the defendant and León paid Official-1 over two million dollars in drug proceeds on the understanding that Official-1 would name their associate to the position if Official-1 won the upcoming election.  (*Id.*).  Although Official-1 failed to honor his promise despite winning the election, the defendant and his co-conspirators continued to infiltrate Honduran military and law enforcement institutions so that their drug trafficking could flourish.  The financial and safety risks increased with the size of the shipments, and the defendant's bribes increased as well as he tried to avoid losing the millions of dollars' worth of cocaine he was responsible for moving through his country.  As the defendant's activities escalated, he paid approximately $100,000 in bribes— just within Honduras—in connection with each shipment.  (*See id.* ¶ 13).

### 3. 2008 – 2010: The Defendant Imports Ephedrine for the Sinaloa Cartel

Between 2008 and 2010, the defendant diversified his operations by working to receive large shipments of ephedrine at Puerto Cortés, which is the biggest commercial port in Honduras. (PSR ¶ 14).  Juancho León was murdered in approximately the middle of 2008, and the defendant assumed a leadership role in his cell of Honduran traffickers with respect to the distribution of both cocaine and ephedrine.

The ephedrine scheme was part of a wildly successful, and deeply criminal, effort by the Sinaloa Cartel to manufacture large quantities of methamphetamine outside of Mexico, which was then transported north over land, like the cocaine, and imported into the United States.  The defendant worked directly with important Cartel managers to set up satellite operations in

8

Guatemala and Honduras, including at a laboratory operated in part by Cartel personnel in the Cortés Department where the port was located.  (*See id.* ¶ 15).  Chief among the defendant's ephedrine co-conspirators was Cesar Gastelum Serrano, who was a key lieutenant of Joaquin El Chapo Guzman, a/k/a "El Chapo," and "one of the most prolific cocaine suppliers for Mexico's Sinaloa Cartel."  (*See* PSR ¶ 14 (referring to "a man named Cesar")).[14]

In 2008, the defendant required high-level Honduran political support in order to act as a sufficiently reliable partner for Chapo and Gastelum Serrano, so he also paid additional bribes to Mario Fernando Hernández Bonilla, a cocaine distribution co-conspirator and Honduran congressman purporting to represent the people of Cortés.  (*See* PSR ¶ 53 (noting that the defendant and Hernández Bonilla "engaged in drug trafficking activities" for "several years" including storing cocaine in San Pedro Sula, Honduras)).  Hernández Bonilla, in turn, helped the defendant pay bribes to customs officials at Puerto Cortés in order to clear entire shipping containers full of the illicit precursor chemical through the facility.  The defendant's payments to Hernández Bonilla stopped, as discussed below, when the defendant elected to have Hernández Bonilla murdered in November 2008.  (PSR ¶¶ 53-56).  The assassination, however, did not slow the defendant's steady flow of illegal drug cargo into Puerto Cortés.  The defendant helped bring into Honduras numerous containers of ephedrine, with an approximate aggregate weight of 20 tons, during the two-year period between 2008 and 2010.  (PSR ¶ 9).

### 4.  2010 – 2014: The Defendant Focuses Exclusively on Cocaine Distribution

The defendant continued to distribute cocaine while also bringing ephedrine into Honduras through Puerto Cortés until approximately 2010.  Between 2010 and the defendant's provisional

---

[14] OFAC, Treasury Targets Prolific Mexican Drug Trafficker Cesar Gastelum Serrano (Dec. 23, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl9730.aspx.

arrest in 2014, he spent the remainder of his time at liberty distributing cocaine so that it could be imported into the United States.

By the end of 2010, if not before, the defendant established direct connections to Colombian cocaine suppliers such as Sebastian Osorio Lopez, a/k/a "Tato." (*Id.* ¶ 17; *see also id.* ¶ 24 (referring to Colombian suppliers known as "Anti" and "Tin"); *id.* ¶ 45 (referring to Colombian supplier known as "Cachanito")). The defendant also developed his own connections in Guatemala, such as José Manuel López Morales, a/k/a "Che."[15] As the defendant integrated his operations, his profit margins increased. He was no longer forced to buy cocaine from other Honduran traffickers, such as the Montes Bobadilla family, who received maritime shipments of cocaine from their own South American contacts. That said, the defendant was opportunistic and worked at times on drug shipments with other large and violent Honduran drug-trafficking organizations, such as the *Cachiros* in Colón, led by Devis Leonel Rivera Maradiaga,[16] and *Los Valles* in Copán. (*See* PSR ¶ 22). [17]

In approximately November 2011, a pair of confidential sources working at the direction of the DEA infiltrated the defendant's drug-trafficking organization. (*Id.* ¶ 23). During recorded meetings in San Pedro Sula that month, the defendant spoke with the sources and others about transporting large shipments of cocaine into the United State via Mexico. (*Id.*). The sources met with the defendant and others in Honduras again in July 2012. (*Id.* ¶ 25). Following two days of negotiations, the sources told the defendant that they would provide 350 kilograms of cocaine in

---

[15] Paragraph 24 of the PSR refers to Lopez Morales as "FNU LNU, a/k/a 'Che.'"

[16] Rivera Maradiaga is a cooperating witness who co-led the *Cachiros* drug-trafficking organization with his brother, Javier, until late 2013 when they started to assist the DEA.

[17] *See* OFAC, Los Valles Organization Targeted for OFAC Sanctions (Aug. 20, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.

New York City at a consignment price of $31,000 per kilogram.  (*Id.*).  The defendant and his associates sent a worker to New York for the transaction.  (*Id.* ¶ 26).  In New York, the sources told the defendant's worker that the quality of the drugs was poor.  In reality, the DEA and the sources involved in the negotiations lacked access to the quantities of cocaine sought by the defendant.

The defendant's months-long negotiations with DEA informants did not keep him from distribution thousands of kilograms of cocaine between 2011 and his provisional arrest in Honduras in October 2014.  In addition to his work with the *Cachiros* and *Los Valles*, the defendant reinvested drug proceeds to develop his own secure clandestine airstrips in Honduras, which he used to receive cocaine-laden aircraft dispatched from Venezuela.  (PSR ¶ 17; *see also, e.g.*, *id.* ¶ 21).  The PSR contains examples of these shipments, such as a 400-kilogram drug flight in approximately December 2011, and a 350-kilogram drug shipment in approximately May 2013. (*Id.* ¶¶ 24, 28).

## B.  The Defendant's Weapons and Violence

The defendant was a heavily armed drug trafficker, who worked with and employed other heavily armed drug traffickers, to protect his drugs.  Prior to the defendant's arrest, he owned approximately 40 firearms, including machineguns and shotguns.  (PSR ¶ 44).  In January 2013, Honduran authorities raided one of the defendant's mansions in Choloma, Cortés, and seized, among other weapons, a gold-plated AK-47:

11




The defendant's co-conspirators also possessed, in addition to similar caches of firearms, larger weapons such as rocket-propelled grenade launchers.  (*Id.*).

Between approximately 2000 and 2013, the defendant participated in and/or helped cause at least approximately 19 murders and the attempted murder of his partner, Diaz Morales.  With respect to "two or three" of the murders, the defendant "[does] not remember the names [of the victims] or the circumstances of these additional killings."  (PSR ¶ 57).  As discussed below, two of the murders involved torture, and one attack resulted in the murder of the defendant's target ("Muco") as well as nine other people.

### 1.  2000: The Murder of a Potential Kidnapper

In approximately 2000, the defendant believed that a Honduran man was planning to kidnap the defendant's son for ransom.  (PSR ¶ 50).  Having already spent at least approximately two years as a drug trafficker working for Mario León alongside corrupt members of the Honduran National Police, the defendant paid an officer from the Copán Department, based in La Entrada, to murder the man.  (*Id.*).

### 2. 2003: The Torture and Murder of a Drug-Trafficking Rival

In approximately 2003, around the time that the defendant assumed a management role under Juancho León, in the wake of Mario León's murder, a rival known as "Chepe Piko" stole one of the defendant's cocaine shipments.  (PSR ¶ 51).  The defendant directed Diaz Morales to look into the incident.  (*Id.*).  In order to do so, Diaz Morales kidnapped a man who worked for Chepe Piko, brought the man to a ranch in Copán, and tortured the man until he admitted that Chepe Piko orchestrated the robbery.  (*Id.*).  Based on that admission, the defendant instructed Diaz Morales to murder the worker and traveled to the ranch where he was being held.  (*Id.*). When the defendant arrived, other workers placed the still-living victim in a recently dug grave. (*Id.*).  The defendant's workers then shot the man, and the defendant fired one round into the victim's body.

### 3. 2006: The Murder of Danny Hernandez

In approximately 2006, the defendant learned that Danny Hernandez, one of his workers, was having an affair with the defendant's wife.  (PSR ¶ 52).  The defendant confronted Hernandez and told him that he "did not want to see [Hernandez] again."  (*Id.*).  The defendant also told other workers to "take Hernandez away."  (*Id.*).  The defendant's workers forced Hernandez into a car and murdered him.

### 4. 2008: The Assassination of Congressman Mario Fernando Hernández Bonilla

In November 2008, French authorities seized a large quantity of ephedrine as it passed through a port in France on its way to Puerto Cortés.  (*See* PSR ¶ 53).  The defendant was not a party to the seized shipment.  News of the incident upset him greatly, however, because the reports suggested that someone in Honduras was importing ephedrine without allowing the defendant to participate financially (and potentially in competition with the Sinaloa Cartel).  (*See* PSR ¶ 55).

13

The defendant discussed the ephedrine seizure with Diaz Morales and indicated that he suspected, based on his lack of awareness of the shipment prior to the seizure, that Hernández Bonilla was engaging in ephedrine transactions without allowing the defendant and his partners to share in the proceeds. Based on that concern, the defendant instructed Diaz Morales to investigate whether his suspicions regarding Hernández Bonilla were correct. The defendant also told Diaz Morales, in substance, that if Hernández Bonilla was doing something "bad" then they (the defendant and Diaz Morales) would have to do something about it and Hernández Bonilla had to be killed. (*See* PSR ¶ 55).

Based on the defendant's instructions, Diaz Morales conducted the investigation and helped arrange for the assassination of Hernández Bonilla. On November 23, 2018, Hernández Bonilla was murdered in San Pedro Sula. (PSR ¶ 56). Carlos Collier, who was the head of a Honduran state-owned telecommunications company at the time, was also killed in the attack.

### 5. 2010: The Attempted Murder of Diaz Morales

In approximately 2010, a Colombian drug supplier told the defendant that Diaz Morales owed a debt to the Colombian for prior drug shipments. (PSR ¶ 45). The defendant was unaware of the prior shipments, and his reaction to the news was similar to his reaction in 2008 when he found out that Hernández Bonilla was importing ephedrine into Honduras without his knowledge.

For over a year, the defendant and Diaz Morales each paid sicarios to kill the other. (*See id.* ¶ 46). The defendant paid a murderer known as Jorge Guifaro, a/k/a "Vaquero," to kill Diaz Morales. (*Id.* ¶ 46). He also sought assistance from Rivera Maradiaga, one of the leaders of the *Cachiros*, to access other killers believed to be capable of murdering Diaz Morales. Diaz Morales survived several attempts on his life by men working at the direction of the defendant, while at the same time coordinating and paying for similarly violent attacks against the defendant and his

associates.

### 6. 2013: The Torture and Murder of "Raffa"

In approximately 2013, Rivera Maradiaga reported to the defendant that Esvin Escalante—a member of the *Cachiros* and the defendant's brother-in-law—had been kidnapped, tortured, and murdered by two men, known as "Raffa" and "Muco," with assistance from the Honduran National Police. (PSR ¶ 47; *see also* Def. Mem. at 8 (referring to defendant's prior marriage to Elvia Escalante)). The defendant introduced Rivera Maradiaga to his go-to killer, Guifaro, and they worked together to find Raffa. (*Id.* ¶ 48).

Rivera Maradiaga located Raffa by approximately April 2013. (PSR ¶ 48). The defendant traveled with Rivera Maradiaga to a construction site near San Pedro Sula. By the time they arrived, Raffa had already been tortured and shot in the abdomen and leg. (*Id.*). The defendant and Rivera Maradiaga checked Raffa's pulse, confirmed that he was dead, and each shot Raffa's corpse once more. (*Id.*).

### 7. 2013: The Massacre Resulting in the Murder of "Muco"

Weeks after the murder of Raffa, Guifaro reported to the defendant that he had killed Muco in connection with a shootout that resulted in approximately nine additional deaths. (PSR ¶ 48).

## III. Procedural History

In November 2012, the defendant was charged in a one-count Indictment with participating in a conspiracy to distribute and possess with the intent to distribute cocaine, in violation of Title 18, United States Code, Section 846. (PSR ¶ 2). He was provisionally arrested in Honduras in October 2014, and he was extradited to this District in February 2015. (*See id.* at 1). On September 3, 2015, the defendant pleaded guilty to the sole count in the Indictment. (*Id.* ¶ 4).

15

## THE SENTENCING GUIDELINES AND DEFENSE OBJECTIONS TO THE PSR

### I. The Guidelines and the Probation Office Recommend Life Imprisonment

The Probation Office properly calculated a Guidelines offense level capped at 43 and Criminal History Category I, resulting in a recommended Guidelines sentence of life imprisonment.  (PSR ¶¶ 82, 86, 122).  This calculation includes the maximum drug-quantity thresholds for cocaine and methamphetamine, and enhancements based on, among other things, the defendant's possession of weapons, violence, bribes to law enforcement, criminal livelihood, and leadership role.  (PSR ¶¶ 70-77).

Perhaps for reasons of efficiency, given the offense level, the Probation Office declined to engage with the Government's upward-departure arguments based on (i) an offense resulting in death under U.S.S.G. § 5K2.1, (ii) the discharge of firearms under U.S.S.G. § 5K2.6, and (iii) conduct that was "unusually heinous, cruel, brutal, or degrading to the victim" under U.S.S.G. § 5K2.8.  (PSR ¶ 137).  In any event, the Probation Office recommends a sentence of life imprisonment.  (PSR at 27-30).

### II. The Defendant's Factual Objections to the PSR

The Government consents to modifying factual portions of the PSR based on the defendant's factual objections, except as specified in this section.  (*See* Def. Mem. 1-3).

#### A. PSR Paragraph 18

The defendant's characterization of his interactions with Eric Francisco Mendoza Zuniga is false, and an indication of the extent to which he is seeking to minimize his offense conduct and is not credible in these proceedings.  (Def. Mem. at 2 ¶ iii).  The defendant had a social relationship with Mendoza Zuniga beginning in approximately 2008.  As stated in the PSR, in mid-2011, after the defendant lost several workers through either fear or murder related to his war with Diaz Morales, the defendant asked Mendoza Zuniga to help him coordinate the receipt of drug

16

shipments.  The defendant introduced Mendoza Zuniga to the defendant's drug-trafficking peers, such as Marco Antonio Merren Funes, a/k/a "Don Marcos," and Mendoza Zuniga's primary function was to relay information to other participants as they worked together to receive cocaine-laden aircraft in Honduras.

### B.   PSR Paragraph 29

To be clear, the purported law enforcement personnel referenced in this paragraph were not actually employed by the United States, and the defendant appears to have been defrauded in connection with this incident.  (Def. Mem. at 2 ¶ iv).

### C.   PSR Paragraph 33

The defendant's claim that he "did not volunteer" to bribe Official-1 because "he believed correctly" that "the candidate would lose" is inaccurate and another instance of minimization. (Def. Mem. at 2 ¶ v).  The assertion is inaccurate in that Official-1 won the election.  The argument also reflects minimization, as there is every reason to believe—in light of the defendant's numerous bribes to other politicians, police, and military officials—that he was a fully supportive participant in the bribery scheme because of the immense official protection that the traffickers could have obtained had the defendant's ally been appointed to the position as promised.

### D.   PSR Paragraph 42

The transaction described in paragraph 42 reflects a part of the defendant's "laundering operation."  (Def. Mem. at 2 ¶ vii).  Specifically, in approximately 2011, the defendant used $1.6 million in drug proceeds to purchase a house in San Pedro Sula—*i.e.*, a seemingly untainted asset—and the defendant's associate put his name on the deed in an effort to mask the defendant's control over that asset.  In approximately 2013, the defendant and Yankel Rosenthal Coello transferred the title to one of the associate's relatives as part of an unsuccessful effort to avoid

having the house seized by Honduran law enforcement.[18]

### E.   PSR Paragraph 51

Paragraph 51 accurately summarizes the Government's evidence related to this torture-murder incident.  The Government does not credit the defendant's claim that he "believed" the victim "had already expired" when the defendant arrived at the ranch.  (Def. Mem. at 3 ¶ viii).  Indeed, the defendant participated in efforts to interrogate the victim regarding Chepe Piko before the victim was placed in the grave and murdered.

### F.   PSR Paragraph 52

The Government does not object to revising the PSR to add the defendant's dubious explanation for his role in causing yet another murder by his workers.  In context, however, the defendant's arguments do not mitigate the horrific nature of his actions.  He seems to acknowledge as much by stating, in a notably understated fashion, that he "certainly understands how that might have been construed to be an order" for his workers to murder the victim.  (Def. Mem. at 3 ¶ ix).

### G.   PSR Paragraph 55

Based on conversations with defense counsel subsequent to the filing of the defendant's sentencing submission, the Government understands that counsel retracts the argument that Diaz Morales carried out the murder of Hernández Bonilla "on his own," and that the defendant's position at sentencing is that he did not give Diaz Morales a "final order" to murder Hernández Bonilla.  (*See* Def. Mem. at 3 ¶ x).  The defendant admits, however, to making the above-described statements to Diaz Morales regarding Hernández Bonilla, including that Hernández Bonilla had to

---

[18] In August 2017, Rosenthal Coello pleaded guilty to a money laundering offense, in violation of Title 18, United States Code, Section 1957.  *See United States v. Rosenthal, et al.*, 13 Cr. 413 (JGK).  In January 2018, Judge Koeltl sentenced Rosenthal Coello principally to 29 months' imprisonment and a $50,000 fine.

be killed if he was participating in the distribution of ephedrine without the defendant and Diaz Morales.  The Government also understands, based on conversations with defense counsel, that the defendant asserts that a long period passed between his conversation with Diaz Morales and the assassination of Hernández Bonilla.  According to the enclosed DEA report and news articles, however, the seizure occurred during November 2008, which is also the month when Hernández Bonilla was murdered.  (*See* Ex. A at 2; Ex. B at 3; Ex. C at 4).

To the extent the defendant persists in the objection set forth in his submission, the Government will request a *Fatico* hearing.

### H.  PSR Paragraph 118

The United States has not seized any of the defendant's assets, and the Government does not credit the defendant's claim that the Honduran government has seized all of the approximately $50 million that he made in connection with drug trafficking.

## III.  The Defendant's Objection to the Leadership Enhancement is Meritless

The defendant objects to the four-level leadership enhancement, *see* U.S.S.G. § 3B1.1(a), based on the argument that "his transportation of contraband was merely a part of the larger overall conspiracy."  (Def. Mem. at 4).  The objection is meritless.

### A.  Applicable Law

Section 3B1.1(a) provides for a four-level increase "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  "Prior to imposing a leadership enhancement under section 3B1.1(a), a sentencing court must make 'specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive.'"  *United States v. Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) (quoting *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir. 1997)).  The Guidelines "only require that the defendant be an

organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate." *Id.* "[O]ne conspirator's leadership role is not dispositive on the question of whether another was also a leader." *United States* v. *Duncan*, 42 F.3d 97, 106 n.6 (2d Cir. 1994).

### B. Discussion

The defendant does not dispute that his "criminal activity" involved more than five participants and was otherwise extensive. U.S.S.G. § 3B1.1(a). Instead, he suggests that there was a "larger overall conspiracy" and that his prolific drug trafficking in Honduras was "only a part thereof." (Def. Mem. at 4 ¶ iii). The defendant cannot avoid the consequences of his leadership role by adjusting the frame of reference to focus on the entire Americas region. *See* U.S.S.G. § 3B1.1 app n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

The defendant's objection is also in significant tension with his acknowledgments, which are required by overwhelming evidence, that he ran a "transportation network" for cocaine and that "his organization" maintained "employees." (Def. Mem. at 17). While the defendant may have been relegated to middle management prior to the 2003 death of Mario León and the 2008 death of Juancho León, he took on a leadership role between at least approximately 2008 and 2014 in connection with the distribution of large quantities of both cocaine and ephedrine. For example, the defendant recruited Mendoza Zuniga to work for him. (PSR ¶ 18). The defendant was responsible for paying bribes to Honduran law enforcement and military personnel who acted at his direction in protecting drug shipments. (*E.g.*, *id.* ¶ 32). The defendant deployed Luis Ascanio Blanco to Colombia to develop new contacts and find planes that the defendant could use in drug shipments. (*Id.* ¶ 19). Finally, the defendant, as leader, gave orders to Diaz Morales and other workers in connection with several murders in furtherance of his drug-trafficking enterprise,

including the assassination of a congressman and "two or three" murders with respect to which he gave "orders" but purports not to remember why he did so.  (*Id.* ¶¶ 51, 55, 57).  Accordingly, the Court should apply the four-level leadership enhancement.

<u>**DISCUSSION**</u>

## I.  The Court Should Impose a Life Sentence

The balancing of the Section 3553(a) factors weighs in favor of the statutory maximum sentence of life imprisonment.

The defendant committed brutal crimes that warrant the most severe punishment available. For more than 15 years, he led a sophisticated criminal enterprise that is responsible for the importation into the United States of approximately 135 tons of cocaine.  (PSR ¶ 9).[19]  For two years within that span, he also brought approximately 20 tons of ephedrine into Honduras so that he could work directly with the Sinaloa Cartel to manufacture methamphetamine.  The defendant did these things in connection with a prolonged course of conduct that involved all of the evils associated with such a brazen crime—murder, torture, corruption, bribery, and money laundering. But-for his extradition and the Rule of Specialty, he would be facing far more serious charges and at least a mandatory-life term of imprisonment if not capital punishment.  *See* 21 U.S.C. § 848(e)(1)(A); 18 U.S.C. § 924(j); *see also* 18 U.S.C. § 924(c)(1)(b)(ii) (30-year mandatory consecutive sentence for firearms offense involving machineguns).

The scale of the defendant's drug trafficking was so massive that it is difficult to fathom the full extent of the individual, personal consequences of his crime in this country.  While it may be true that the defendant "had no personal contact with the United States" prior to arriving in this

---

[19] Paragraph 9 of the PSR provides an accurate estimate of the applicable drug quantities.  Other paragraphs understate it.  (*E.g.*, PSR ¶ 64).

District for prosecution, he had an enormously damaging impact here from afar by helping to send a deluge of cocaine and methamphetamine.  (Def. Mem. at 7).  As the Court has noted previously, "[t]he harm that is done by a ton of cocaine is almost incalculable.  The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering."[20]  The defendant sent millions of individual-use cocaine doses to this country, without regard to the victims here, in order to enrich himself and his family.  And because that is true, there is great irony in the defendant's argument that his personal drug use constitutes a mitigating consideration at sentencing.  (*See* Def. Mem. at 4).  Despite the defendant's addiction, he was still capable of operating a billion-dollar drug operation, and his consumption of cocaine gave him unique insights into the harm he was causing in the United States.  He nevertheless persisted in that course for years.

The defendant's conduct also compromised Honduran political institutions that are supposed to support law-abiding citizens, and corrupted military and law enforcement bodies intended to protect the public.  In the summer of 2016, as various aspects of the investigation unfolded in this District, the Honduran government declared an "emergency situation" with respect to the Honduran National Police—the organization that the defendant relied upon and bribed for over a decade to protect his drug shipments.[21]  Consistent with that corruption, notwithstanding extensive law enforcement activity in Honduras targeting the defendant as a drug trafficker since at least approximately 2013, the Mayor and Director of Justice of Santa Rita, Copán, both issued certificates to the Court in connection with sentencing indicating that the defendant has displayed

---

[20] (Tr. 27, *United States v. Palagio Suarez*, 16 Cr. 453 (RJS) (Dkt. No. 160)).

[21] (Superseding Indictment ¶ 2, *United States v. Zelaya Romero, et al.*, 15 Cr. 174 (LGS) (Dkt. No. 35)).

"good moral principles," "excellent conduct," and "honest[y]."  (Def. Mem. Ex. A at 31, 36).

When sentencing a former member of the Honduran National Police on a drug trafficking charge, Judge Schofield aptly summarized the harm to Honduras and the United States arising from this type of drug trafficking:

> It is sometimes difficult in drug cases to realize how serious the crime is and its impact on people, but I am sure just from looking at the society in Honduras and how it has been ravaged by drug dealers, that you have seen how serious and how negative drugs can be on the population in many ways, and so it is not just the people in Honduras that have been affected, it is also the people in the United States who were the ultimate consumers and buyers of these drugs.[22]

Today, the *New York Times* published a piece explaining that, in Honduras, "corruption has rotted the police" and "[t]he corruption is what allows all the other bad things to happen.  It allows gangs to impose a reign of terror.  It allows nine in 10 murderers to get away with their crimes.  It fuels poverty . . . ."  (Ex. D at 3, 14).

The defendant helped to ravage not only his own country, but also every other nation through which his drugs passed on their way to the United States.

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces.  This drug activity contributes to all of that.  It is organized crime.  When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries.  It is a serious crime.[23]

The consequences of the defendant's actions in South and Central America are every bit as tragic as the impact in the United States.  During the defendant's reign, poverty spread and the murder rate in Honduras became one of the highest in the world.  Although that statistic is reportedly improving, people are fleeing Honduras and contributing to dangerous conditions in Guatemala

---

[22] (Tr. 20, *United States v. Valladares Garcia*, 15 Cr. 174 (LGS) (Dkt. No. 357)).

[23] (Tr. 21, *United States v. Cabezas Garcia*, 17 Cr. 23 (RJS) (Dkt. No. 71)).

and Mexico as well as immigration and security challenges on the southern border of the United States.  By helping to establish Honduras as one of the premier transshipment points in the world for U.S.-bound cocaine, the defendant also contributed to problems in South America.  Venezuela, where traffickers in the *Cartel de Los Soles* are alleged to have used cocaine as a weapon against the United States dating back to 1999, is in the midst of a human rights crisis.[24]

Very few drug-trafficking cases involve the mix of aggravating factors that this one does, and therefore a life sentence will not result in unwarranted sentencing disparities.  According to the Sentencing Commission, in 2017, less than 13% of reported cases involving cocaine resulted in a drug quantity in excess of 450 kilograms, and less than 10% of reported cases involving methamphetamine involved a level-38 drug quantity:

**BASE OFFENSE LEVELS FOR DRUG TRAFFICKING IN EACH DRUG TYPE[1]**

Circuits: none selected        Fiscal Years: 2017

| DRUG TYPE | TOTAL | 6 | 8 | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 | 26 | 28 | 30 | 31 | 32 | 33 | 34 | 36 | 38 | 43 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL | 18,935 | 115 | 27 | 57 | 550 | 401 | 945 | 601 | 574 | 525 | 3,233 | 1,255 | 945 | 3,287 | 307 | 1,979 | 289 | 1,790 | 813 | 1,223 | 19 |
| Powder Cocaine | 3,736 | 3 | 1 | 3 | 120 | 60 | 101 | 87 | 68 | 80 | 587 | 265 | 224 | 846 | 26 | 368 | 17 | 270 | 143 | 467 | 0 |
| Crack Cocaine | 1,526 | 0 | 4 | 5 | 82 | 55 | 78 | 47 | 58 | 63 | 501 | 142 | 76 | 249 | 0 | 83 | 4 | 43 | 21 | 15 | 0 |
| Heroin | 2,626 | 0 | 1 | 1 | 201 | 84 | 122 | 96 | 86 | 90 | 549 | 247 | 152 | 572 | 29 | 223 | 4 | 96 | 17 | 43 | 13 |
| Marijuana | 2,696 | 74 | 14 | 26 | 45 | 129 | 531 | 275 | 239 | 200 | 805 | 109 | 58 | 105 | 3 | 44 | 0 | 26 | 9 | 4 | 0 |
| Methamphetamine | 7,077 | 0 | 0 | 0 | 42 | 41 | 48 | 53 | 58 | 54 | 570 | 361 | 340 | 1,324 | 243 | 1,141 | 256 | 1,304 | 600 | 642 | 0 |
| Other | 1,274 | 38 | 7 | 22 | 60 | 32 | 65 | 43 | 65 | 38 | 221 | 131 | 95 | 191 | 6 | 120 | 8 | 51 | 23 | 52 | 6 |

The defendant's drug quantities, of course, involve multiples of these thresholds.

Judge Forrest faced a somewhat similar—but still not as serious—situation in *United States v. Suarez*, 11 Cr. 836, 2014 WL 1998234, at *3 (S.D.N.Y. May 15, 2014).  In *Suarez*, the court sentenced a Colombia-based drug trafficker to 648 months' imprisonment, which the court

---

[24] (Superseding Indictment ¶ 2, *United States v. Hugo Armando Carvajal Barrios*, S1 11 Cr. 205 (AKH)).

intended to be "effectively a life sentence."  791 F.3d 363, 365 (2d Cir. 2015).[25]  Judge Forrest found that the offense involved "thousands of kilograms of cocaine" as well as weapons possession.  The court also applied enhancements for leadership and criminal livelihood, and concluded that the defendant "caused men armed with weapons to murder two men."  2014 WL 1998234, at *3 (S.D.N.Y. May 15, 2014).  The defendant distributed more cocaine than Suarez, he paid more bribes, and he had many more people killed.  Thus, *Suarez* supports the imposition of a life sentence here.

The prosecution of Fabio Lobo, the son of former Honduran President Porfirio Lobo Sosa, is another apt comparator.  Lobo pleaded guilty to participating in a conspiracy to import cocaine into the United States, and challenged several sentencing enhancements at a *Fatico* hearing.  The Government established at the hearing that Lobo helped transport 1.4 tons of cocaine in Honduras, and agreed to participate in a three-ton shipment that was proposed by confidential informants in connection with a DEA sting investigation.  There was no evidence that Lobo participated in acts of violence like the defendant.  Judge Schofield sentenced Lobo to 24 years' imprisonment, and emphasized general deterrence at sentencing.[26]  On appeal, the Circuit held that, "[c]onsidering the breadth of Lobo's corruption and the extent of his criminal activity, the district court acted well within its discretion when it imposed a sentence reflecting the need to deter government officials from using their positions of power to facilitate drug trafficking."  *United States v. Romero*, 749 F. App'x 31, 34-35 (2d Cir. 2018).  Like Lobo, the defendant was not a public official himself, but

---

[25] In *Suarez*, the Government made assurances in connection with the extradition process that the defendant would not be sentenced to a life term of imprisonment, which appears to be why Judge Forrest imposed a term of years.  The Government made no such assurances to Honduras in this case.

[26] (Judgment, *United States v. Lobo*, 15 Cr. 174 (LGS) (Dkt. No. 250)).

he used such officials in connection with drug trafficking.  As in *Lobo*, the sentence imposed must communicate to the public that this conduct will not be tolerated and will be punished to the fullest extent of the law.  Because the defendant's conduct is more culpable in nearly every respect than Lobo's, a life sentence is appropriate.

All of the above considerations support the imposition of the statutory maximum sentence, and the defendant has done little to mitigate his culpability.  He lied to the Probation Office by asserting that he was "self-employed in agriculture."  (PSR ¶ 116).  He also told the Probation Office that he had a "difficult" childhood, which his attorney characterizes as "horrific," but he admitted to having "basic necessities," an opportunity to pursue some schooling, and farming skills.  (PSR ¶¶ 93-94, 112; Def. Mem. at 8; *see also* Def. Mem. Ex. A at 25 (defendant's brother observing, "[w]hat I can tell is that in our home we were raised with good values, both religious as well as moral")).  Most importantly, no one forced the defendant to become a drug trafficker, and no one forced him to continue in that line of work for 15 years.  By the time he started to distribute cocaine in 1998, he was a 24-year-old adult whose adolescent challenges were behind him.  It is also apparent that, to the extent the letters submitted on behalf of the defendant are sincere, he deceived many of those close to him prior to being arrested and likely endangered them during that process by placing them near his high-risk activities.  (*See* Def. Mem. Ex. A at 6 (brother asserting that defendant "was never a violent man on the contrary always very warm"); *id.* at 38 (long-term friend writing  that "[n]ever have I seen in him an act of violence or aggression towards others")).  Therefore, the defendant's arguments in mitigation do not outweigh the seriousness of his conduct, and the need for the sentence to promote respect for the law and general deterrence.

## II.    The Court Should Impose $50 Million of Forfeiture

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989). The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010). The defendant admitted to the forfeiture allegation in the Indictment, and he made approximately $50 million based on his drug-trafficking crime. (PSR ¶ 9). Therefore, the Court should order the defendant to forfeit that amount.

## III.    The Court Should Order the Defendant to Pay a $10 Million Fine

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The burden of establishing inability to pay rests on defendant." *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)). The defendant cannot meet that burden based on a conclusory claim to the Probation Office, corroborated only by a phone call to a self-interested sibling with incentives to secrete criminally derived property, that the Honduran government seized all of his assets. (PSR ¶ 118 & n.14). Indeed, the defendant reported "several farms" in Guatemala that Honduran authorities appear to lack authority to seize. (*Id.* ¶ 116; *see also id.* at 29 ("[W]e believe he may have undisclosed assets.")). Therefore, the Government respectfully submits that the Court should

order the defendant to pay a fine of $10 million.  (*See* PSR ¶ 130 (noting Guidelines fine range of $25,000 and $10 million)).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment, require forfeiture in the amount of $50 million, and order the defendant to pay the statutory maximum fine of $10 million.

Dated: New York, New York
        July 29, 2019

                                        Respectfully Submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York


                            By:     ___/s/_____
                                        Emil J. Bove III
                                        Matthew J. Laroche
                                        Assistant United States Attorneys


Cc:     Defense Counsel
        (Via ECF)


29